



IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

BRADY L. DAVIS                    :        CIVIL ACTION

    V.                            :        NO.: 1:00-CV-00543

FRANK GILLIS, JOSEPH KORT, M.D., et :
al.                                        JURY TRIAL DEMAND
                                  :        Judge Rambo

**FILED
SCRANTON**

AUG 21 2000

PER _____
        DEPUTY CLERK

EXHIBITS OF JOSEPH KORT, M.D. IN SUPPORT OF HIS MOTION
TO DISMISS THE COMPLAINT OF BRADY L. DAVIS

# EXHIBIT A



# IN THE UNITED STATES DISTRICT COURT OF THE MIDDLE DISTRICT:

BRADY L. DAVIS
        Plaintiff

vs.

Superintendent, F. Gillis,
Medical Administrator, W. Sewell,
Medical Director, Dr. Kort,
Unit Manager, Lee Grover,
Counselor, C. Custer,
Parole Board Chairman, W. Ward,
Parole Supervisor, Brian Stout,
Records Supervisor, Raymond W. Reeder,
Any and all other Defendants will be added under
Discovery;  All Defendants are sued in their Individual Capacities
and Official Capacities,
        Defendant(s)

COMPLAINT

JURY TRIAL DEMANDED

1:CV00-0543

FILED
SCRANTON
MAR 24 2000
PER _____
DEPUTY CLERK

RECEIVED
SCRANTON
MAR 23 2000
PER _____
DEPUTY CLERK

## Preliminary Statement

This is a Civil Rights Action filed by Brady L. Davis, a State prisoner, for damages and injunctive relief under 42 U.S.A. § 1981, 1983, 1985, 1986, alleging Denial of due process and Conspiring to detain me from my freedom, which is a Violation of the Eighth and Fourteenth Amendments of the United States.

## Jurisdiction

1.  The Court has jurisdiction over the plaintiff's Claims of Violations of Federal Constitutional Rights under 42 U.S.A. §§ 1331(a) and 1343.

2.  The Court has Supplemental Jurisdiction over the plaintiff's State Tort Law Claims under 28 U.S.A. § 1367.



**"Parties"**

3.  The plaintiff Brady Davis was incarcerated at Coal Township Correctional Facility (Coal Township) during the event described in this complaint.

4.  Defendant, Frank D. Gillis, Superintendent, employed at Coal Township is sued in his individual capacity.

5.  Defendant, Brian Stout, Parole Supervisor, employed at Coal Township is sued in his individual capacity.

6.  Defendant, Raymond W. Reeder, Records Supervisor, employed at Coal Township, is sued in his individual capacity.

7.  Defendant, Lee Grover, Unit Manager, employed at Coal Township is sued in his individual capacity.

8.  Defendant, Charles Custer, Counselor, employed at Coal Township, is sued in his individual capacity.

9.  Defendant, William Ward, Chairman of Parole Board, is sued in his individual capacity.

10.  Defendant, W. Sewell, Medical Administrator, is sued in her individual capacity.

11.  Defendant, Dr. Kort, Medical Director, is sued in his individual capacity.

## FACTS
## DUE PROCESS ISSUES

12.  It all started May 4, 1998, I was arrested by my parole officer.  I was taken to Graterford.  On May 14, 1998, I had a revocation hearing as a T.P.V. and C.P.V.  On May 16, 1998, I was brought to S.C.I. Coal Township.  My record came with me.

13.  In my file was information that I was to do 6 to 23 months work release at Montgomery County to start May 19, 1998; however, Coal Township ignored that fact and held me until my max's had expired which was 10-3-98, because they nor the Parole Board extend my max's date before it expired.  They violated the due process rule.

14.  They did not send me to Montgomery County, until 10-6-98, three days after my max, which was 10-3-98.  My State Representative called Coal Township on 10-3-98, and asked them how were they going to keep me here if they did not have documents to keep me past the expiration date which was 10-3-98.

15.  They then decided to send me to Montgomery County, but I had been here for (5) months.  The Board gave me a (9) month hit 5-14-98, so I had (4) months left when they sent me to Montgomery County, although, I was supposed to do Montgomery County time first violation of 9757 of 21 Pa. which states if a parolee's sentence were aggregated, then at any given moment during confinement violator could not have been characterized as serving any particular sentence but serving all of them pursuant to aggregated sentence and thus, aggregated sentence would make it impossible for Board of Parole to comply with Act 61 Pa.C.S. 331.21A(A).

16.  With that in mind after I did the (5) months at Montgomery County, my (9) months hit was up because now I have (10) months in one month over the (9) month hit.  However, Coal Township sent for me when the time at Montgomery County was over.



17.   To add to the abuse Coal Township, gave me a negative recommendation saying I was argumentative, because the State Representative and my family were calling the institution showing concern about me being staffed.  They were concerned, because a parolee is supposed to be staffed 3 or 4 months before their minimum @ I was (7) months past my maximum, which adds up to (11) months past the due process mark.  However, the board came to see me 9-14-99 over (17) months after they gave me the (9) months hit.

18.   They unbelievably gave me a (12) month hit.  They gave no explanation for it except that I was a danger to society, although, they had letters from my community saying I was an asset to the community.  Letter from State Representative, City Council member and Mt. Airy Businesses and Neighbor Association.

19.   This is abuse of authority, for them to make the mistake that they did and try to correct it by punishing me even more is totally unjustifiable, and because of this, the people that I provide employment and shelter for is losing.  Because of this my community and myself is pleading with the Court to correct this unjust situation and relief plaintiff.

20.   When I returned to Coal Township, May 20, 1999, a year later after I recieved the (9) month hit, I had to stay in isolation because there were no beds, but in fact inmates were being admitted in regular population who arrived after me.  I was held in isolation for (30) days under false arrest.

21.   I complained to the Counselor, Unit Manager and to the administration, but received no help.



## MEDICAL COMPLAINTS

22.  I am a diabetic, who have to use insulin for my sugar regulation.

23.  When I came back to Coal Township, May 20, 1999, I did not receive my insulin for two (2) days.  I became ill.  I was taken to the dispensary, my sugar level was 385.  It was around 10]30 p.m., the nurse called the doctor at home, he got upset and told her to send me back to my cell.

24.  The next day my sugar level was 199 on the morning of May 22, 1999.

25.  On May 23, 1999, the doctor instructed the nurse to discontinue my evening insulin.  He never examined me or checked my sugar level to know if it was alright to stop my evening insulin.

26.  On May 24, 1999, I complained to the administration of the Medical Department, Miss Sewell.

27.  On June 2, 1999, I was refused my lunch bag, which is a part of my diabetic treatment.  John Doe, officer who give out the meals.

28.  On June 3, 1999, I was taken to the dispensary, because I was not receiving my medication.  This was about 11:30 p.m. The nurse called another doctr who said keep me there for observation.  My sugar level was 284.  Dr. Kort came the next morning and said he was not going to give me my proper insulin until I get out of the hole.

29.  On June 6, 1999, I put in a sick call slip, on June 8, 1999 a doctor came to see me.  I explained to him that I was getting headaches, he said he was going to speak with Dr. Kort, about me receiving my evening insulin.  No one ever came back to



30. On June 14, 1999, a represenative from the Administration of Department of Medical came to see me, who represented Miss Sewell. I explained to her about my headaches and other problems. I heard nothing from anyone after that.

31. On June 22, 1999, I went to the dispensary. My sugar level was 309.

32. As I was about to leave the dispensary, Dr. Kort said to me, "I see you're out the hole, are you still complaining."

33. I went back the next day my sugar level was 348, I explained to Dr. Kort that I needed my evening medicine, his reply was, "I will teach you what being a diabetic will do to you."

34. I have been ill from the day I was taken off my proper medication. Which was May 23, 1999. This happened after I became ill May 21, 1999 and the nurse called the doctor at his home. He became upset, told the nurse not to give me anything, and from that day he has refused to give me my proper medication.

35. On 1-29-2000, I became ill. I could not eat. That night I pushed the emergency button to get some medical assistance. A nurse came to see me. I explained to her that I was nausea and that I was seeing crystal element. I explained to her that this had happened to me before and it was my blood pressure, but she would not check it. She checked my sugar level; it was fine because I was not eating anything. She gave me two (aspirin). I paid her for that visit. She requested that I put in a sick call slip. I put in the sick call slip, the next day a doctor came to see me 1-30-2000. I explained to him the symptoms that I was experiencing. He said he could not see me unless I paid him. I explained to him that I had just paid the nurse for this same illness the night before, then he just left.



36.  On 1-31-2000, I became more ill.  I called for emergency and asked them to bring the blood pressure equipment, he did and my pressure was high.  He instructed me to submit another sick call slip.  I did and a different doctor came 2-1-2000.  I explained to him my symptoms.  He increased my medication.  I was ill for (4) days because the medical department would not give me the proper medical attention.  I am also a diabetic, I need an accu-check, preferably daily, but the medical department has not given me one for (60) days.  This may be part of my illness, because when my pressure is high, it causes the body to act abnormal.  I am supposed to get an accu-check daily, but for the last year the doctor refuses to give me one.  He gives me one once a month and when I request for one, he charges me for it, although I am a chronic patient.  The state's rule is if you are a chronic patient, you do not have to pay for medical service, if it relates to your chronic illness.  I have explained to the Medical Department, that all institutions that I have been in gave me an accu-check twice a day.

37.  Because diabetic sugar level is not stable and if it's up or down, it is dangerous.  Diabetes is a silent killer, and if it's not treated properly, it causes permanent damage.  So when it's high and not detected, your life is being shortlived.  This doctor knows this and is not giving accu-checks only because of his own selfish reason.

Claims for Relief

1.  Superintendent, F. Gillis, Failure to correct the matter is a violation of the Fourteenth and Eighth Amendment of the United States Constitution.

2.  Administrator of Medical, W. Sewell, Failure to correct the matter, is a violation of the Fourteenth and Eighth Amendment of the United States Constitution.

3.  Director of Medical, Dr. Kort, Failure to give plaintiff proper medication, is a violation of the Fourteenth and Eighth Amendment of the United States Constitution.

4.  Unit Manager, Lee Grover, Failure to correct the matter, is a violation of the Fourteenth and Eighth Amendment of the United States Constitution.

5.  Counselor, C. Custer, Failure to correct the matter, is a violation of the Fourteeth and Eighth Amendment of the United States Constitution.

6.  Chairman of Parole Board, W. Ward, Failure to correct the matter, is a violation of the Fourteenth and Eighth Amendment of the United States Constitution.

7.  Parole Supervisor, Brian Stout, Failure to correct the matter, is a violation of the Fourteenth and Eighth Amendment of the United States Constitution.

8.  Records Supervisor, Raymond W. Reeder, Failure to correct the matter, is a violation of the Fourteenth and Eighth Amendment of the United States Constitution.

RELIEF REQUESTED

Wherefore, Plaintiff requests that the Court grant the following:

(A)  Issue a declaratory judgement stating that:

1.  The isolation that plaintiff suffered from Superintendent Gillis, violated plaintiff's Fourteenth and Eighth Amendment of the United States Constitution and award punitive damages in the following amount, $50,000.

(B)  Issue a judgement ordering defendant Lee Grover to pay plaintiff $25,000 for punitive for violation plaintiff's Fourteenth and Eighth Amendment of the United States Constitution.

(C)  Issue a judgement ordering defendant C. Custer to pay plaintiff $25,000 for punitive damages for violation of plaintiff's Fourteenth and Eighth Amendment of the United States Constitution.

(D)  Issue a judgement ordering defendant W. Sewell, to pay plaintiff $35,000 for punitive damages for violation of plaintiff's Fourteenth and Eighth Amendment of the United States Constitution.

(E)  Issue a judgement ordering defendant Dr. Kort to pay plaintiff $150,000 for punitive damages for violation of plaintiff's Fourteenth and Eighth Amendment of the United States Constitution.

(F)  Issue punitive damages of $50,000 for plaintiff from W. Ward for violation of plaintiff Fourteenth and Eighth Amendment of the United States Constitution.

(G)  Issue punitive damages of $50,000 for plaintiff from Raymond W. Reeder, for violation of plaintiff's Fourteenth and Eighth Amendment of the United States Constitution.

(H)  Issue punitive damages of $35,000 for plaintiff from B.
Stout, for violation of plaintiff's Fourteenth and Eighth
Amendment of the United States Constitution.

(I)  Issue such other relief as it may appear that plaintiff
is entitled.

Respectfully Submitted,

*Brady Davis*

Brady L. Davis,
Plaintiff
S.C.I. Coal Township
One Kelley Drive
Coal Township, PA  17866-1020

Date:  3-1-00         + 2000

IN THE UNITED STATES DISTRICT COURT OF THE MIDDLE DISTRICT:

BRADY L. DAVIS,

          Appellant


## CERTIFICATE OF SERVICE

AND NOW, this ___/___ day of March, 2000, I Brady L. Davis, pro se, appellant in the above captioned case, hereby certify that I this day served the foregoing REPLY BRIEF FOR APPELLANT by causing a copy of the same to be deposited in the United States mail postage prepaid, at Coal Township, Pennsylvania, addressed as follows:

        United States Middle District Court
        P.O. Box 1148
        Scranton, PA  18501


3-1-00
_____
Dated

                  *Brady Davis*
                  _____
                  Brady L. Davis

AUG  1'00 12:59 FR THE PRINCETON INS CO 609 452 9451 TO 912157821010        P.15

V.    Relief

(State briefly exactly what you want the court to do for you. Make no legal arguments. Cite no cases or statutes.)

1.    To please look into the reason why Dr. Bekele, denied, and ignore the numerous requests of the plaintiff to see the E.N.T. Specialist that performed the operations to the middle right ear that plaintiff has complained about numerous times, of experienceing discomforts of severe ear pain, headaches, and lost of balance, dizziness. Since initial middle right ear surgery, On 1-6-98;.

2.    To please also look into the reason why the Health Care Administrator Donald Fiske, did not provide the plaintiff with a visit to the E.N.T. Specialist that was authorized to performed the operations and treated the plaintiff for his condition for the hearing loss to the middle right ear. Why did Donald Fiske, denied and ignore  the plaintiff concern of serious need to see Specialist.

3.    Relief Requested by the plaintiff is for Damages.

Signed this   24th   day of _____ June _____ ,2000 .

_____
(Signature of Plaintiff)

I declare under penalty of perjury that the foregoing is true and correct.

June 24th 2000
_____
(Date)

_____
(Signature of Plaintiff)

3

# EXHIBIT B



POLICY STATEMENT

**Commonwealth of Pennsylvania ● Department of Corrections**

| Policy Subject: | | Policy Number: |
|---|---|---|
| **Consolidated Inmate Grievance Review System** | | **DC-ADM 804** |
| Date of Issue: | Authority: | Effective Date: |
| July 20, 1994 | Joseph D. Lehman, Commissioner | Oct. 20, 1994 |

## I.   AUTHORITY

The Authority of the Commissioner of Corrections to direct the operation of the Department of Corrections is established by Sections 201, 206, 506, and 901-B of the Administrative Code of 1929, Act of April 9, 1929, P.L. 177, No. 175, as amended.

## II.   PURPOSE

It is the purpose of this Administrative Directive to establish policy regarding the Consolidated Inmate Grievance Review System and to ensure that inmates have an avenue through which resolution of specific problems can be sought.

This directive sets forth procedures for the review of Inmate Grievances not already covered by other Administrative Directives and policies. It also provides the method through which review procedures established by other directives are to be integrated with the procedures outlined in this directive.

## III.   APPLICABILITY

This policy is applicable to all employees of the Department of Corrections and all inmates under the jurisdiction of the Department of Corrections and to those individuals and groups who have business with or use the resources of the Department of Corrections.

## IV.   DEFINITIONS

A.   Grievance -

The formal written expression of a complaint submitted by an inmate related to a problem encountered during the course of his/her confinement.

B.   Grievance Coordinator -

The Corrections Superintendent's Assistant in an institution or the Assistant to the Regional Director in Community Corrections who is responsible for the overall administration of the Inmate Grievance System in that facility\region. This includes all data collection, tracking and statistical reporting. At the direction of the Facility Manager or Community Corrections Regional Director, the Grievance Coordinator may be called upon to provide Initial Review of certain grievances.



DC-ADM 804

C.  Grievance Officer -

An appropriate Department Head or Management Level staff person designated by the Facility Manager or CC Regional Director to provide Initial Review of an inmate grievance arising from his/ her specific area of responsibility, e.g., a Unit Manager would be assigned to provide Initial Review of a grievance from the housing unit.  If the grievance arises from the Food Services Area, the Grievance Officer designated by the Facility Manager shall be the Food Services Manager, likewise, the Corrections Health Care Administrator would be the Grievance Officer for a grievance related to a Health Care issue.

D.  Central Office Review Committee (**CORC**) -

A committee of at least three (3) Central Office staff appointed by the Commissioner of Corrections to include the Commissioner, Executive Deputy Commissioner and Chief Counsel or their designees.

With the exception of appeals from disciplinary action under DC-ADM 801 and appeals arising from Health Care or medical treatment grievances, the CORC Shall have responsibility for direct review of all Inmate Appeals for Final Review.

E.  Central Office Medical Review Committee (**COMRC**) -

A committee appointed by the Commissioner to include the Director of the Bureau of Health Services and relevant Bureau staff.  The COMRC shall have responsibility for direct review of grievance appeals related to Health Care and medical treatment issues.

F.  Initial Review -

The first step in the formal Inmate Grievance Process for all issues except those already governed by other specified procedures (see VI E).  All reviews conducted below the level of Facility Manager or Regional Director are considered initial reviews.

G.  Appeal from Initial Review -

The first level of appeal of a decision rendered at Initial Review.  This appeal is directed to the Facility Manager or Community Corrections Regional Director.

**An appeal of the Initial Review decision on a grievance related to a Health Care or Medical issue shall be submitted directly to the COMRC at Central Office.**

**Only issues raised at Initial Review shall be appealed.**

H.  Final Review -

Upon completion of Initial Review and appeal from Initial Review, an inmate may seek Final Review from the Central Office Review Committee (**CORC**), for any issue involving continued non-compliance with Department of Corrections directives or policy, the ICU Consent Decree or other law.

## V.  POLICY

A.  It is the policy of the Pennsylvania Department of Corrections that every individual committed to its custody shall have access to a formal procedure - the Consolidated Inmate Grievance Review System - through which the resolution of problems or other issues of concern arising during the course of confinement may be sought.  For every such issue there shall be a forum for review and an avenue of appeal, but only one.

DC-ADM 804

B. Informal Resolution of Problems  -   All inmates are expected to attempt to resolve problems or differences with staff on an informal basis through direct contact or by sending a request slip to appropriate staff. Action taken by the inmate to resolve the situation must be indicated on the grievance form, Section B.

The Grievance Form, DC 804, Part I, is available in each Housing Unit or upon request from Unit staff. This is the proper form to be used for submission of a grievance and it should be completed according to the directions provided.

**It is required that a genuine effort be made to resolve the problem before the grievance system is used. The inmate must document these efforts in Section B of the Grievance Form. Failure to do so may result in the grievance being returned to the inmate without action. The inmate may then refile the grievance with Section B properly completed.**

C. Any inmate using the grievance system shall do so in good faith and for good cause.

No one shall be punished, retaliated against or otherwise harmed for good faith use of this grievance system.

Deliberate misuse of the grievance system may result in restricted access or disciplinary action, at the discretion of the Facility Manager.

D. It is the intent of the Department of Corrections to provide for an accelerated review of appeals of grievances related to medical issues.  For this reason, the inmate is permitted to appeal a medical grievance to the Central Office Medical Review Committee for Final Review directly from Initial Review.  See VI., C. 1.

E. The Inmate Grievance Review System is intended to deal with a wide range of issues, procedures or events which may be of concern to inmates.  It is not meant to address incidents of an urgent or emergency nature.  When faced with such an event, the inmate should contact the nearest staff member for immediate assistance.

## VI. PROCEDURES

A. A Grievance  shall  be  submitted  to  the  Grievance Coordinator in the following manner.

1. All grievances shall be in writing and in the format provided on the forms supplied by the institution (DC-804 Part 1).  See Section V., B.

2. All  grievances  shall be presented individually. Any grievance submitted by a group of inmates will not be  processed,  however, if the Grievance Coordinator believes that the issue being grieved is legitimate, it will be referred to appropriate Management Staff for review.

3. Only an inmate who has been personally affected by a Department or institution action or policy shall be permitted to seek review of a grievance or appeal.   The inmate grievant must  sign  the grievance or appeal.

4. All grievances and appeals must be presented in good faith.  They shall include a brief statement of the facts relevant to the claim. The text of the grievance must be legible and presented in a courteous manner.  The inmate should identify any persons who may have information which could be helpful in resolving the grievance.  The inmate may also specifically state any claims he/she wishes to make concerning violations of Department directives, regulations, the ICU Consent Decree or other law. The inmate may request to be personally interviewed prior to the decision on Initial Review.   Any inmate who submits  a  grievance containing false and malicious information may be subject to disciplinary action.

DC-ADM 804

5. Grievances and appeals based on different events should be presented separately, unless it is necessary to combine the issues to support the claim. The Grievance Officer may combine multiple grievances which relate to the same subject.

**NOTE:**    At any point in the grievance process, the inmate has the right to withdraw the grievance.

B. Initial Review

1. Initial Review Procedures must be completed before Appeal from Initial Review or Final Appeal may be sought. Any claims of violation of the ICU Consent Decree must be raised through this grievance procedure before they may be addressed by any court.

2. Grievances must be submitted for initial review to the Facility/Regional Grievance Coordinator within fifteen (15) days after the events upon which the claims are based. Extensions of this time period may be granted by the Facility Manager/Regional Director for good cause.

3. The Grievance Coordinator will forward the grievance to the appropriate Grievance Officer for investigation and resolution. The inmate grievant and other persons having personal knowledge of the subject matter may be interviewed. A grievant who has requested a personal interview, shall be interviewed.

4. Within ten (10) working days of receipt of the grievance by the Grievance Officer, the grievant shall be provided a written response to the grievance to include a brief rationale, summarizing the conclusions and any action taken or recommended to resolve the issues raised in the grievance.

   The Grievance Coordinator may authorize an extension of up to an additional ten (10) working days if the investigation of the grievance is pending. If an extension is necessary, the grievant shall be so advised in writing.

C. Appeal from Initial Review

1. An Initial Review Decision of a grievance on a Health Care or medical treatment issue may be appealed directly to the Central Office Medical Review Committee for Final Review within five (5) days of receipt by the inmate of the Initial Review decision. A grievance for which the Corrections Health Care Administrator conducted the Initial Review will usually be considered a Medical Grievance.

   All other appeals will be submitted as follows.

2. An inmate may appeal an initial review decision to the Facility Manager or Community Corrections Regional Director in writing, within five (5) days from the date of receipt by the inmate of the Initial Review decision. **The inmate must appeal in this manner prior to seeking Final Review. Only issues which were raised for initial review may be appealed.**

3. All appeals must conform to the requirements specified in Section VI A of this directive. The appeal must clearly identify the decision appealed from and all reasons for appeal. Only one appeal from any initial review decision will be permitted.

4. The Facility Manager or Regional Director must notify the inmate of his/her decision within ten (10) working days after receiving the appeal. This decision may consist of approval, disapproval, modification, reversal, remand or reassignment for further fact finding, and must include a brief statement of the reasons for the decision.

DC-ADM 804

D. Final Review

1. Any inmate who is dissatisfied with the disposition of an Appeal from Initial Review decision, may, within seven (7) days of receiving the decision, appeal any issue related to non-compliance with the ICU Consent Decree, other law, Department directive or policy, for final review. Only issues raised at the Initial Review and Appeal level may be referred for Final Review.

2. Final Review will not be permitted until the inmate has complied with all procedures established for Initial Review and Appeal from Initial Review. Exceptions may be made for good cause.

3. Final Review of all appeals will be sent directly to the CORC except the following:

a. Medical Grievances which will be reviewed by COMRC.

b. Requests for Final Review of appeals from disciplinary actions which were processed through DC-ADM 801. These will be reviewed by the Office of the Chief Counsel which may respond directly to the inmate or refer the appeal to the Central Office Review Committee (CORC) for further reviews.

The address of the **CORC/COMRC** is:

**PA DEPARTMENT OF CORRECTIONS**
**CENTRAL OFFICE REVIEW COMMITTEE**
**PO BOX 598/2520 LISBURN ROAD**
**CAMP HILL, PA 17001-0598**

4. Requests for Final Review must clearly identify the decision appealed from and all reasons for appeal. Only one appeal from any second level (Appeal from Initial Review) decision will be permitted.

5. The CORC\COMRC, or any member thereof, may require additional investigation to be made prior to a decision on a Final Review appeal.

6. The CORC\COMRC will review all issues properly raised according to the above procedures. It may also review and consider any other related matter.

7. For all Appeals receiving Final Review, the CORC/COMRC will issue its decision within twenty-one (21) days after receipt of an appeal. The decision may consist of approval, disapproval, modification, reversal, remand or reassignment for further fact finding, and must include a brief statement of the reasons for the decision. The committee shall notify the grievant and Facility Manager/Regional Director of its decision and rationale.

8. The Chief Counsel will notify counsel for the ICU class of disposition by the CORC/COMRC of any matter raised on Final Review alleging a violation of the ICU Consent Decree.

E. Exceptions

Initial Review and Appeal from Initial Review of issues related to the following Administrative Directives shall be in accordance with procedures outlined therein, and will not be reviewed by the Grievance Officer or Grievance Coordinator.

1. DC ADM 805 - Policy & Procedures for Obtaining Pre-Release Transfer.

2. DC ADM 801 - Inmate Disciplinary and Restricted Housing Unit Procedures. See DC-ADM 801 VI., G & I

3. DC ADM 802 - Administrative Custody Procedures. See DC-ADM 802, VI, B, 1,2. Appeal from Initial Review, see DC-ADM 802, VI, B, 4, a.

 

DC-ADM 804

   4.  DC-ADM 814 - Incoming Publications

     See 814-IIIB. Appeal from Initial Review, see 814-IIID.

Additionally, there may be other kinds of issues for which Initial Review Procedures have been previously established by Administrative Memorandum or Policy Statement.

F.  Admissions and Review

  1.  All proceedings pursuant to this directive are in the nature of settlement negotiations and will, therefore, be inadmissible before any court or other tribunal in support of any claim made against the Commonwealth or any employee. No resolution of any grievance offered as a result of this procedure shall be admissible before any court or other tribunal as an admission of violation of the ICU Consent Decree or any State or federal law.

  2.  No decision rendered as a result of the processing of a grievance shall be reviewable by any court unless it establishes a system or institution-wide violation of the decree.

G.  Completion of Review After Transfer

Any inmate who is transferred after the filing of a grievance or appeal, but prior to the completion of the appeal process, may continue to pursue the grievance or appeal by notifying the Facility Manager or Regional Director of the facility in which confined when the grievance was filed. Adjustments in the various time limitations may be made to facilitate review.

## VII. SUSPENSION DURING EMERGENCY

In an emergency situation or extended disruption of normal institutional operation, any provision or section of this policy may be suspended by the Commissioner or his/her designee for a specific period of time.

## VIII. RIGHTS UNDER THIS POLICY

This policy does not create rights in any person nor should it be interpreted or applied in such a manner as to abridge the rights of any individual. This policy should be interpreted to have sufficient flexibility so as to be consistent with law and to permit the accomplishment of the purpose of the policies of the Department of Corrections.

## IX. SUPERSEDED POLICY AND CROSS-REFERENCE

This directive revises the Inmate Grievance System (DC-ADM 804, MAY 1, 1984), and supersedes the pilot grievance system in effect at selected DOC institutions. It does not supersede or repeal any portion of any other directive or policy statement. Where this directive is inconsistent with any other directive or policy, both shall be interpreted so as to provide full review of all issues raised, consistent with the scope and purpose of this directive. Conflicts will most frequently occur at the Initial Review level, where other directives establish committees to review specific issues.

Cross References:  DC-ADM 801, DC-ADM 802

ACA Cross-References: 3-4271

cc:  Executive Deputy Commissioner Reid
     Deputy Commissioner Clymer
     Deputy Commissioner Fulcomer
     Acting Deputy Commissioner Beard
     All Superintendents
     CCC Directors (4)
     File

Joseph D. Lehman,
Commissioner



**Bulletin**

**Commonwealth of Pennsylvania • Department of Corrections**

| To: | Policy Subject: |
|---|---|
| **Superintendents** **Boot Camp Commander** **Regional Directors** **Executive Staff** | **DC-ADM 804** **CONSOLIDATED INMATE GRIEVANCE REVIEW SYSTEM** |
| | **Policy Number:** DC-ADM 804-1 |
| | **Policy Issue Date:** July 20, 1994 |

| Date of Issue: April 2, 1996 | Authority: | Effective Date: May 20, 1996 |
|---|---|---|

The purpose of this Bulletin is to include medical grievances in the regular grievance process and to **discontinue** the Central Office Medical Review Committee (COMRC). .

It is important that the Superintendent be aware of all functions within the institution. Similarly, it is essential that the Bureau of Health Care Services be included in the CORC process, to include review by the Chief Counsel's office with respect to medical grievances. Therefore, all grievances, including those relating to medical issues, are to be processed in the same manner. The grievance coordinator will continue to forward medical grievances to the CHCA for initial review. Then, the Superintendent will be responsible for the Appeal from Initial Review, as for all other grievances.

Final Appeal of medical grievances will no longer be forwarded to the COMRC. The Central Office Review Committee (CORC) will process the appeals. The Director of the Bureau of Health Care Services, or designee, will participate as a member of CORC for all medical grievance appeals.

The following sections of DC-ADM 804 are to be **discontinued:**

      IV.E.:     Definition of COMRC

      IV.G.:    "An appeal of the Initial Review decision on a grievance related to a Health Care or Medical issue shall be submitted directly to the COMRC at Central Office.

      V.D.:    "It is the intent of the Department of Corrections to provide for an accelerated review of appeals of grievances related to medical issues. For this reason, the inmate is permitted to appeal a medical grievance to the Central Office Medical Review Committee for Final Review directly from Initial Review."



| | |
|---|---|
| | **Bulletin** |
| | **Commonwealth of Pennsylvania • Department of Corrections** |

| | | | |
|---|---|---|---|
| **To:** | Executive Staff<br>Superintendents<br>Regional Directors | **Policy Subject:** | Consolidated Inmate<br>Grievance Review System |
| | | **Policy Number:** DC-ADM 804-2 | |
| | | **Policy Issue Date:** July 20, 1994 | |
| **Date of Issue:**<br><br>October 1, 1997 | **Authority:**<br>*Martin F. H* | | **Effective Date:**<br><br>November 1, 1997 |

The procedures for appeal to final review under DC-ADM 804, VI, D, 5-7, are amended as follows:

(1)    The Chief Hearing Examiner will replace the Central Office Review Committee (CORC) at final review of all grievance appeals. The Chief Hearing Examiner will perform all functions previously performed by CORC.

(2)    In reviewing grievances submitted for final review, the Chief Hearing Examiner will review the initial grievance and response, any appeals therefrom and the responses thereto and the issues appealed to final review.

(3)    The Chief Hearing Examiner will review health care related grievances with the Bureau of Health Care. Appeals raising legitimate legal issues, including but not limited to access to courts and sentencing issues, will be reviewed with an attorney prior to response.

(4)    Upon completion of final review, the Chief Hearing Examiner will respond directly to the inmate in all cases where the position taken by the institution is upheld.

(5)    In all cases where the action of the Grievance Coordinator, PRC, Incoming Publication Review Committee, or Superintendent is reversed or amended, or where a matter is remanded, the Chief Hearing Examiner will prepare a letter to the inmate and a memorandum to the Superintendent. The Chief Hearing Examiner will forward the letter and memorandum to the appropriate Regional Deputy Commissioner for review and signature.

(6)    The Chief Hearing Examiner will be responsible for assuring that:

        (a)    appeals to final review are responded to in a timely fashion;
        (b)    records pertaining to such appeals are maintained properly; and
        (c)    counsel for the ICU class is notified of the disposition at final review of any matter raised to final review alleging a violation of the ICU vs Shapp Consent Decree.

It is the intent of the Department of Corrections to provide inmates with a complete and timely review of all appeals properly raised to final review. These amendments have been established to ensure timeliness at final review while continuing to provide a thorough, impartial review of the issues.



**Bulletin**

**Commonwealth of Pennsylvania • Department of Corrections**

| To: | Executive Staff<br>Superintendents<br>Regional Directors<br>Boot Camp Commander | **Policy Subject:** Consolidated Inmate Grievance Review System |
|---|---|---|

**Policy Number:** DC-ADM 804-3

**Policy Issue Date:** July 20, 1994

| **Date of Issue:**<br>October 21, 1997 | **Authority:** | **Effective Date:**<br>November 1, 1997 |
|---|---|---|

The purpose of this bulletin is to facilitate timely responses from the Chief Hearing Examiner's Office to all appeals to final review.

(1) All appeals to final review should be addressed to the Chief Hearing Examiner,

> Chief Hearing Examiner
> 1451 S. Market Street
> Elizabethtown, PA 17022

Appeals which are addressed to the Commissioner, Chief Counsel, to other Central Office staff, are of course, delivered to these individuals first, then have to be referred to the Chief Hearing Examiner. Improperly addressed appeals may cause a delay in the response to final appeal.

(2) Inmates appealing to final review are responsible for providing the reviewing body with any available paperwork relevant to the appeal. A proper appeal to final review should include photocopies of the initial grievance, initial grievance response, and the Superintendent's response. Appeals without proper records will be reviewed, but the review will be delayed until the appropriate paperwork can be obtained.



**Bulletin**

**Commonwealth of Pennsylvania • Department of Corrections**

| **To:** | **Policy Subject:** |
|---|---|
| Executive Staff<br>Superintendents<br>CCC Regional Directors<br>Boot Camp Commander | Consolidated Inmate Grievance Review System |
| | **Policy Number:** DC-ADM 804-4 |
| | **Policy Issue Date:** July 20, 1994 |

| **Date of Issue:** | **Authority:** | **Effective Date:** |
|---|---|---|
| April 29, 1998 | Martin F. Horn | May 1, 1998 |

The purpose of this bulletin is to amend the section VI. Procedures, A.4. to read,

"All grievances and appeals must be presented in good faith. They shall include a brief statement of the facts relevant to the claim. The text must be legible and presented in a courteous manner. The Grievant should identify any persons who may have information which could be helpful in resolving the grievance. The Grievant may specifically raise any claims concerning violations of Department of Corrections directives, regulations, court orders, or other law. The Grievant may also include a request for compensation or other legal relief normally available from a court. The inmate may request to be personally interviewed at initial review. Any inmate who submits a grievance containing false information may be subject to disciplinary action. Inmates who have not already completed final review may request compensation or legal relief on appeal to final review."

And to amend Section VI. Procedures, B. Initial Review, 2. to read:

"Grievances must be submitted for initial review to the Facility/Regional Grievance Coordinator within fifteen (15) days after the events upon which the claims are based. Extensions of this time period may be granted by the Facility Manager/Regional Director for good cause. Such extensions will normally be granted if the events complained of would state a claim of violation of federal right.

# EXHIBIT C

*Tal ottale to note to dens*
*IN Hype donte ases*
*+ dees forfeci—*
*Th Sder*

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

MICHAEL C. PEOPLES,                    :
                                       :    CIVIL ACTION NO. 3:CV-97-0205
        Plaintiff,                     :
                                       :
    vs.                                :                      FILED
                                       :    (JUDGE CONABOY)   SCRANTON
COMMISSIONER HORN, et al.              :
                                       :                      DEC 31 1997
        Defendants.                    :
                                       :
                                                             CIC
                                                         DEPUTY CLERK

                    MEMORANDUM AND ORDER

    Presently before the Court is a Report and Recommendation

filed by United States Magistrate Judge Thomas M. Blewitt. (Doc.

90).   The Magistrate Judge recommends that the Plaintiff's com-

plaint be dismissed in its entirety because the Plaintiff has

failed to exhaust his administrative remedies.   The Plaintiff has

not filed any objections to the Magistrate Judge's disposition.

Thus, after carefully reviewing the Report and Recommendation only

for plain error or manifest injustice, Cipollone v. Liggett Group,

Inc., 822 F.2d 335, 340 (3d Cir. 1987) cert. denied, 484 U.S. 976

(1987); Henderson v. Carlson, 812 F.2d 875, 878 (3d Cir. 1987),

cert. denied 484 U.S. 837 (19487), we shall adopt the Report and

_____

    [1] Although the Plaintiff has filed a motion for enlargement of
time to file an objection to the Magistrate Judge's recommended
disposition (Doc. 92), we deny it as moot in light of our
determination made in this Memorandum and Order.   Based upon our
review, the Plaintiff has clearly failed to exhaust his
administrative remedies.   Accordingly, his complaint is dismissed
without prejudice.

                                1

Recommendation of the Magistrate Judge and dismiss the complaint in its entirety.

### FACTUAL AND PROCEDURAL BACKGROUND

The Plaintiff commenced this action pursuant to 42 U.S.C. § 1983 claiming numerous violations of his First, Fourth, Fifth, Sixth, Eighth, and Fourteenth amendment rights. (Doc. 1). He is an inmate at the State Correctional Institution at Smithfield and is proceeding pro se. The Plaintiff filed an amended complaint on May 6, 1997. (Doc. 16).

The Defendants have filed a number of motions to dismiss. (Docs. 19, 27, 44, 47 and 50). However, not all of the motions are ripe for disposition. Nevertheless, our preliminary review of this action directs us to dismiss the complaint based upon the Plaintiffs failure to exhaust his administrative remedies.

### DISCUSSION

With respect to the applicability of administrative remedies, 42 U.S.C. § 1997e(a) reads as follows:

> No action shall be brought with respect to prison conditions under section 1979 of the Revised Statutes of the United States (42 U.S.C. § 1983), or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

This provision makes no distinction between an action for damages, injunctive relief, or both. Thus, prisoners are required to exhaust available administrative remedies prior to initiating a

2

prison conditions case brought pursuant to 42 U.S.C. § 1983 or any other federal law.

The Pennsylvania Department of Corrections has a Consolidated Inmate Grievance review System. DC-ADM 804 (effective October 20, 1994).  With certain exceptions not applicable here, DC-ADM 804, Section VI ("Procedures") provides that , after attempted informal resolution of the problem, a written grievance may be submitted to the Grievance Coordinator; an appeal from the Coordinator's decision may be made in writing to the Facility Manager or Community Corrections Regional Director; and a final written appeal may be presented to the Central Office Review Committee.  If the grievance concerns an alleged medical problem any appeal must be taken to the Central Office Medical Review Committee.

The instant suit concerns the Plaintiffs alleged violation of his First, Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendment rights.  On the question of administrative exhaustion, the complaint includes a question relating to what steps the prisoner took in the state prisoner grievance procedure.  The Plaintiff indicates that although he filed "DC-804 Part I Grievances" with respect to his medical and non-medical grievances, they "were put down via semantics, et., etc., etc. And I was pursecuted (sic) because of my efforts to obtain relief." (Doc. 1, p. 2).  There is no indication that he appealed the dismissal of this grievance.  In that connection, the procedure contemplates several tiers of review and the Grievance Review System is not exhausted when an inmate files a grievance and then takes no other action through established chan-

3

nels when a grievance is not resolved to his or her satisfaction. Plaintiff's apparent failure to comply with 42 U. S. C. § 1997e(a), as amended, warrants the dismissal of his complaint but without prejudice.  See Pew v. Imschweiler, et al., Civil Action No. 96-0760 (M.D. Pa. September 12, 1996) (Kosik, J.); Johnson v. Gillis, et al., Civil Action No. 96-1569 (M.D. Pa. August 29, 1996) (Conaboy, J.); Lubawski v. Horn, et al., Civil Action No. 96-1371 (M.D. Pa. July 29, 1996) (Rambo, C.J.); Smith v. Giza, Civil Action No. 96-1167 (M.D. Pa. July 2, 1996) (Rambo, C.J.); Brooks v. Superintendent Lunk of Div. 10, et al., No. 96C3221, 1996 WL 308268 (N.D. Ill. June 5, 1996).

Richard P. Conaboy
United States District Judge

DATE: 12/31/97

4

# EXHIBIT D

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

CLERK OF COURT

| | | |
|---|---|---|
| JOHN SYKES | : | CIVIL ACTION |
| | : | NO. 99-6208 |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| MARTIN HORN, et al., | : | |
| | : | |
| Defendants. | : | |

FILED

MAR 2 4 2000

MICHAEL E. KUNZ, Clerk

By_____ Dep. Clerk

ORDER

AND NOW, this 21st day of March, 2000, after a hearing
in which all of the parties participated, it is hereby ORDERED
that:

1.   Defendant Khin's motion to dismiss plaintiff's
amended complaint (doc. # 5) and the Commonwealth defendants'
motion to dismiss plaintiff's amended complaint (doc. # 7) are
GRANTED.[1]

_____

1.   Plaintiff brought this action claiming violations of 42
U.S.C. § 1983, the Pennsylvania Constitution, and Pennsylvania
common law.  For purposes of these motions, the following facts
taken from plaintiffs amended complaint are deemed true.  The
prison's plumbing detail, to which plaintiff was assigned, was
trying to repair a leak in the prison's hot water circulation
loop.  As part of that effort, plaintiff was instructed to dig a
trench on prison property while 200 degree water was pouring out
of a nearby pipe into the trench.  The ground gave way beneath
plaintiff, who fell into the boiling water, suffering serious
burns.  Defendants, comprised of medical and prison personnel,
failed to take action to lessen plaintiff's pain and instead
intentionally increased his pain by not treating his injuries and
by exacerbating those injuries through their conduct.

Defendants seek to dismiss plaintiff's amended complaint contending, among other things, that plaintiff has failed to exhaust his prison administrative remedies. Specifically, defendants point to § 1997e(a) of the Prison Litigation Reform Act of 1996 ("PLRA"), which provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a).

This court may take judicial notice of the fact that the Pennsylvania Department of Corrections (PDOC) has in place (and had in place at the time of facts giving rise to the instant allegations) a Consolidated Inmate Grievance System available to all state prisoners, which is set forth in Department of Corrections Administrative Directive (DC-ADM) 804. See Fed. R. Evid. 201(b); Peters v. Delaware River Port Auth., 16 F.3d 1346, 1356 n.12 (3d Cir. 1994); see also City of Pittsburgh v. West Penn Power Co., 147 F.3d 256, 259 (3d Cir. 1998) (finding that to resolve 12(b)(6) motion, court may properly look at public records ... in addition to allegations in complaint). This grievance system allows for prisoners to pursue informal resolution of problems concerning prison conditions, to then file a written grievance with the prison administration, and, if the matter is not resolved to the prisoner's liking, to seek an appeal. Indeed, plaintiff does not dispute that he did not pursue the administrative channels or that the PDOC had in place, at the time of his injuries, such an administrative process.

The Third Circuit has recently addressed the PLRA's new exhaustion requirement in Booth v. Churner, ___ F.3d ___, Nos. 97-7487 and 97-7488, 2000 WL 251627 (3d Cir. Mar. 7, 2000), and Nyhuis v. Reno, ___ F.3d ___, No. 98-3543, 2000 WL 157531 (3d Cir. Feb. 15, 2000). In those cases, the Third Circuit has held that before a plaintiff can bring a suit pursuant to § 1983, he or she must exhaust his or her administrative remedies, regardless of whether exhaustion would be "futile."

Nyhuis involved a prisoner who brought suit pursuant to § 1983 claiming that his personal belongings had been improperly confiscated in violation of his constitutional rights. In the instant case, plaintiff characterizes his amended complaint as centering not around prison conditions, but rather as focused on allegations of excessive force. See Pl.'s Supplemental Mem. of Law in Opp'n to Mot. (doc. # 13) at 1-2 (stating that plaintiff's

MAR-24-2000  15:20

P.03/04

2.   The above-captioned matter is DISMISSED without

PREJUDICE for plaintiff's failure to exhaust administrative

remedies.

The case shall be marked closed.

AND IT IS SO ORDERED.

EDUARDO C. ROBRENO,          J.

COPIES BY MAIL ON:

TO:

COPIES BY FAX ON: 3/34/00

TO: Alan S. Gold, Esq.

claims that prison personnel compelled him into great physical
danger, which he in fact suffered, "was an application of
excessive force" and that Dr. Khin failure to take action was
also "an application of excessive force").

Thus, plaintiff, in his supplemental memorandum mailed to
the court on March 7, 2000, argued that Nyhuis was inapposite to
the instant case because "[t]he term 'prison conditions' does
not, however, apply to allegations of excessive force."  Pl.'s
Supp. Mem. at 1.  Booth, decided on March 7, 2000, plainly
precludes plaintiff's position.  "We reject this argument and
hold that Section 1997e(a) applies to excessive force actions."
2000 WL 251627, at *1.  Accordingly, the court will dismiss
plaintiff's 1983 claim for his failure to exhaust his
administrative remedies.  Finally, given the infancy of these
proceedings, the court chooses, pursuant to 28 U.S.C. § 1367, not
to exercise supplemental jurisdiction over plaintiff's remaining
state law claims.

3